WATERMAN ALLEN *v.* EDMUND A. BROWN & another.

A court of equity, will, upon full and satisfactory proof, reform a grant of a sea-weed privilege in a deed of a farm, granting, through the ignorance of the scrivener of the principles of conveyancing, a greater privilege than the parties to the original contract designed, against a purchaser of the privilege and farm from one of them, who bought under a like contract; but where the purchase was induced by the fraudulent misrepresentations of the complainant as to the productiveness and value of the sea-weed

privilege really bargained for, and especially if it appear that the mistake in the grant merely makes the privilege granted equal in productiveness and value to the privilege contracted for as it was represented, the court will not interfere with such a providential adjustment of equities, but will dismiss the complainant's bill, with costs.

BILL IN EQUITY to reform, on account of a mistake in the draughting, two deeds of a tract of land, containing about thirty acres, situated at Quidnesit, in North Kingston, on the shore of Narraganset Bay; the one of said deeds having been executed by the complainant to his son, Collins Allen, and the other by said Collins to Edmund A. Brown, both of whom were made defendants to the bill.

On the 15th day of June, 1854, the complainant being the owner of a farm of about one hundred and fifty acres of land, lying at said Quidnesit, in consideration, as stated in the deed, of $400, conveyed with warranty to his son Collins, thirty acres at the east end of said farm, bounded northerly by the land of the widow and heirs of Thomas Eldred, southerly and easterly on the Narraganset Bay, and westerly by a creek and ditch, and a line running thence northerly to a stake and stones on the Eldred line, which bounds and line separated it from the remaining land of the grantor. The following is a rough sketch of the premises conveyed: —

Immediately succeeding the description of the land granted, the deed contained this clause : " *And I, Waterman Allen, the grantor, convey to the grantee, Collins Allen, one third part or distance of my shore privilege, beginning at the north-east corner, it being the east end of the Eldred line, and running southerly on the east beach ; each party has a right to pass and repass to each other's land, to and from theirs.*"

On the 29th day of December, 1855, Collins Allen, for the nominal consideration of $2000, but really in exchange for the Shaw farm in Exeter of about one hundred and seventy-five acres, belonging to Brown, the defendant, and by him conveyed at the same time to said Collins, conveyed the above tract of thirty acres to Brown, by the same description of the land, sea-weed privilege, and right to pass and repass, as contained in his deed from his father, to which he refers, and with this additional clause : —

" *And Waterman Allen is to have the privilege of tipping up sea-weed on the beach on the Point.*"

The bill, which was filed on the 19th day of November, 1857, charged, in substance, that the real contract of the complainant with his son, Collins, and, subsequently, of the latter with Brown, and which the two deeds were intended by the parties to carry out, was, that the complainant should reserve two thirds of the sea-weed privilege, in distance, on the shore of the tract of land conveyed, and should convey only one third of that privilege, in distance, on that shore, — beginning to measure off the distance for which the privilege was conveyed, at the north-east corner of the tract conveyed, being the east end of the Eldred line, — and going southerly and terminating, as it should measure, on the east beach of the tract ; that such were the instructions given to one Harris Smith, the draughtsman employed to draw the first-named deed, who, as well as the parties, supposed that he had accomplished this purpose of the parties by the above description of what was granted ; that the complainant is unable to read, but was informed and believed that such was the import of the deed, and that his son Collins received his conveyance, and Brown his, and occupied under them, according to this construction ; that in June, 1856, the complain-

ant and Brown employed a surveyor to measure off and bound Brown's sea-weed privilege on the east shore of the tract granted, which he did to the satisfaction of both parties; that they both occupied up to this bound until some time in the fall of 1856, Brown purchasing from the complainant sea-weed taken from that part of the shore bounded out to the complainant, but now claimed by Brown, when some one apprised Brown of his right to claim the sea-weed privilege of the whole shore of the tract granted, under his deed, when he commenced an action of trespass against the complainant for carting sea-weed from that portion of the shore of said tract, which was designed to be reserved to the complainant.

The bill prayed for a reformation of the above deeds according to the contracts of the parties, for an injunction against the suit at law, and for general relief.

Pending the bill, on the 13th day of October, 1858, Brown conveyed the tract for the nominal consideration of $1600, to one Alfred Dawley, not made a party to the bill.

The answer of the defendant Collins Allen, admitted, in general, the facts stated in the bill.

The original answer of the defendant Edmund A. Brown, denies all knowledge of the contract between Waterman and Collins Allen at the time of the conveyance by the former to the latter — but admits the exchange of farms between the said Collins and himself — averring that the farm given by him in exchange contained from 161 to 175 acres of land, some of which was very good, with a dwelling-house, and a new barn costing about $300, and other improvements thereon — all of the value of between $2000 and $2500; that thirty acres of said farm, with the buildings, are worth as much as the land and buildings and sea-weed right admitted by the complainant to have been conveyed in exchange for the whole farm of the defendant — the land and buildings and right aforesaid not being worth more than from six to eight hundred dollars, — and that said Waterman and Collins Allen have often boasted since the trade that they had cheated the defendant out of from $1000 to $1500. The answer further alleges, that the natural capacity of the defendant is weak, and that in his best estate he is

33 *

illy fit to cope with ordinary business men, and especially with one, who, although unable to read, is as sharp and shrewd in matters of trade as the complainant; that at the time of the said exchange of farms, the defendant was in an unusual state of excitement, debility, and weakness, which entirely unfitted him for attention to such matters, and that said Waterman and Collins took advantage of his said incapacity and excitement to overreach him in said exchange; that said Waterman and Collins had the deed of said Collins to him in their possession two or three days, after it was written and before it was executed, for the purpose of examining and understanding the same; that when said deed was originally drawn, the clause as to Waterman Allen was not in it, but was put there after it was executed; the defendant at the time objecting, and reluctantly letting it pass upon the assurance of the complainant and said Collins that there was sea-weed enough, annually, on said farm for its use, and enough more to sell fifty to seventy-five dollars worth; that the defendant never was on the farm conveyed to him by said Collins until some time in the evening of the day preceding that in the forepart of which the trade was made, and that both the complainant and said Collins then frequently told the defendant that there was then on the land about two hundred and fifty loads of sea-weed, and as often assured him that there was annually thrown upon the shore — said by them now to belong to the defendant — enough sea-weed to manure said farm fully, and also enough more for sale to bring him in from fifty to seventy-five dollars per year, and that said farm contained forty acres of land; that the soil of said farm is poor and sandy, and without sufficient sea-weed is worth but a trifle; that the defendant took said land and made said bargain, upon the full reliance that said representations were true; that afterwards, but not till long afterwards, he learned from observation and from those who knew the shore and the sea-weed thrown up there, that so far from these representations being true, he was constrained to believe that the complainant and said Collins knew them to be untrue at the time that they made them; and that, according to his best knowledge and information and belief, there has not been annually, and is not thrown upon said shore more

than fifteen cart-loads of sea-weed and eel-grass, and that said farm does not contain more than about twenty-five acres; that Harris Smith came to his farm one day and told him that he had come to survey the shore at the request of the complainant, and he reluctantly attended to the same, whereupon said Smith did survey the whole shore, and then measured off one third of it, and made a mark on a post on the same; that said Smith at the same time surveyed the westerly line of the farm, but whether to the correct boundaries the defendant cannot tell; though the plaintiffs afterwards admitted that they had run the line upon the defendant, and yet afterwards moved the fence farther east so as to include more of his land; but the defendant admits that he did pay said Smith one half of his account for surveying, though he did not intend thereby to admit the correctness of his surveys; that he did not say to said Smith what he had bought, nor that he had got more than he thought that he should get; that often since the survey the defendant did go southerly of said post and take sea-weed, and that he often told persons that said survey was not right, and that he thought that he ought to have and could hold the entire beach; that wanting at one time a little sea-weed with which to finish his planting, he bought of the complainant one dollar's worth, believing that in justice and equity it belonged to him; that the defendant had ascertained that the complainant and said Collins had greatly cheated him, and feared that he and they would get into a dispute and perhaps into the law, and he desired to sell out and get clear of them, and with this view he advertised said farm and all said shore for sale, but did not sell the same; that the defendant believes that the said Collins Allen, under his deed from his father, used to take, sell, and carry away sea-weed from the southerly shore of said farm; *that it was talked that the defendant was to have the northerly third of said shore,* but it was also talked by the complainant and said Collins that the defendant would have sea-weed enough for all the uses of said farm, and enough more to sell annually, to bring him the annual sum of from fifty to one hundred dollars, and that the defendant relied on their said statements, and believed that he was to have and receive that amount and quantity from said shore annually; and

the defendant avers that his naturally weak mind was so impaired and excited at that time that he does not believe that he had clear understanding of all that he was doing, nor of the consequences and effects of the same; that he did point out to Samuel Spink, and state to Marchant Weeden, Charles T. Hunt, and perhaps to others, the bound set up by Harris Smith, and at the time told them that he was not satisfied with the same; repeating to them what the complainant and said Collins had told him, as to the quantity and value of sea-weed he should have, as before stated; and the defendant may have pointed out or referred to said bound, and have said that he did not own but one third of the shore, though he does not now recollect it; that no one told him about holding the whole of said shore, but that recollecting what had been told him about the quantity of sea-weed, for a long time he could not tell whether said representations were true or false; that he learned from others and from his own observation that they were false, and that he had been greatly cheated and his incapacity taken advantage of; and that in justice and equity he ought to have from said shore said representations made good, and that this he claimed from his own sense of what was just, and not upon the suggestion of any one else; that when his deed was examined he was informed that such was the fair construction of the deed; that he has no recollection of ever asking permission to take sea-weed from the southerly portion of the shore of said farm, or of referring others to the complainant who came to the defendant to buy sea-weed from the same, but avers that he has forbidden the complainant from taking sea-weed from the southerly and easterly parts of the shores of said farm, and has commenced an action against him for taking sea-weed therefrom, which has been sustained. That the complainant has no right to call on the defendant to deliver up for cancellation or reformation a deed to which he was not a party; and the defendant would be glad to have, and now offers to have, both the deeds from him to said Collins, and from said Collins to him cancelled, and each restored to their respective estates as before said exchange.

In his amended answer the defendant, Brown, wholly denies

the contract as set up in the bill, and avers that it was, that he should have not only the sea-weed coming upon the shores of the farm in question, but also have for sea-weed one third of Waterman Allen's remaining shore, and of the creek, and that he drew the deed from Collins Allen to himself, supposing that it would convey such a shore privilege; that the defendant was dissatisfied with Harris Smith's survey, and expressed his dissatisfaction to the complainant and his son, who assured the defendant that he had the best sea-weed privilege on the whole shore, and that he would have hundreds of loads of sea-weed come up on the north shore which they had set off to him; that the survey of Smith was a trick got up by the complainant and his son to destroy the value of the estate conveyed to the defendant for a valuable consideration, after the conveyance; that by the deed of Collins Allen to the defendant, the defendant had the right to go from his shore, west of the creek, and on one third of Waterman Allen's shore, and pass upon said Waterman's beach, and upon the cart-path or drift-way, by said Waterman's barn to the country road; and that the right of tipping sea-weed upon the defendant's point, reserved to Waterman Allen in the defendant's deed from Collins Allen, was inserted in said deed merely because, from the greater boldness of the water there, the sea-weed obtained by said Waterman from his own shore could more easily be taken from that place for sale; that this was the purpose of the reservation as understood by the defendant, and, as he believes, both by Waterman and Collins; that Collins Allen under his deed from Waterman occupied the whole of the east and south shores of the farm up to the creek, and one third of said Waterman's shore west of it, and drew and sold sea-weed from it; that before the survey by Smith, the defendant at different times, without objection from said Waterman, took sea-weed from the whole shore of said farm; that at the time of the making of the deed to this defendant both the said Waterman and Collins represented that all the sea-weed in the farm-yard, of which there was a large quantity, was drawn from the shore of said Collins, and that, in addition, he had sold a large quantity to the people of Bristol and others who came and carried it

away; that said Collins stated that he had let the south shore from Quonset Point to the creek, to John Gladding and William H. Reynolds, for eight months, at fifty dollars; and that the defendant believes said Waterman was present at this statement; that both father and son represented to the defendant that he could plant the whole farm, and cover it all over with sea-weed, and might thus raise one thousand bushels of potatoes in a year, besides having sea-weed for sale. The amended answer also sets up the defendant's conveyance of the farm to Alfred Dawley, on or about the 13th day of October, 1858, and the negotiation preceding the execution of said deed, and the consideration paid by Dawley to the defendant for the same.

To these answers, the general replication having been filed, proof was taken on both sides; that of the complainant, to prove the original contract between Collins Allen and himself, and between the former and the defendant Brown, consisting, principally, of the testimony of Harris Smith, who, as scrivener, drew the deed from the complainant to his son, and who testified that he was instructed to convey only the sea-weed privilege of the north third of the shores of the farm, the remaining two thirds thereof to be reserved to the grantor, and supposed that, by the language he employed, he had carried out his instructions. This witness also swore that in May, 1856, at the request of both Waterman Allen and Brown, he measured off the latter's sea-weed privilege on the east shore of the farm, and put up a bound at the southern terminus of said privilege under the directions, and to the satisfaction of both parties. The complainant also produced several witnesses to admissions of the defendant Brown, that the original contract was as set forth in the bill, and that Brown had, on different occasions, pointed out the bound set by Smith, as the limit of his sea-weed privilege; and that, for the first season of his occupation of the farm, he had taken sea-weed only from the third part of the shore bounded out to him, which was to be taken in connection with the admission in his answer that he had on one occasion bought of the complainant sea-weed from other parts of the shores of the farm.

Besides replying to this evidence, by attempting to impeach

the character of Harris Smith for truth and veracity, with regard to which several witnesses were sworn and deposed on both sides, and showing that Collins Allen, during his occupation of the farm, after the deed of his father, carted sea-weed from the south as well as from the east shore of the farm, and let the south shore from the 12th day of May to the 12th day of December, 1854, to Gladding and Reynolds, as averred in the answer, and that he himself had at sundry times made claims inconsistent with the notion that he understood his sea-weed privilege to be limited as set forth in the bill, the defendant to maintain the defence taken by him, that the exchange of farms was procured from him, whilst in a weak and excited state, by the fraudulent misrepresentations of the complainant and his son as to the productiveness and value of the sea-weed privilege of the farm taken by him, produced several witnesses. Five witnesses were produced and sworn on the part of the defendant: three of them his sisters, and one of them, Mr. John J. Reynolds, with whom the defendant had lived at different times during the last eight or ten years as an assistant in his shop in North Kingston, who testified to his nervous and excited condition at the time of the exchange, and, generally, to his unfitness on this account to conduct such business. Their testimony, in this respect, was confirmed by that of Nicholas Dawley, Brown's brother-in-law, a witness produced for another purpose by the complainant. Four witnesses swore to the representations of the complainant to the defendant Brown, as to the productiveness and value of the sea-weed privilege attached to the farm; one of whom was the complainant's witness, Dawley; and several witnesses also testified as to the falsity of those representations, and some to the complainant's statements indicative of his knowledge of their falsity at the time that he made them. The defendant also produced the depositions of several witnesses as to the relative value of the farm received by him in exchange, with that of the Shaw farm, given by him in exchange, with and without the sea-weed privilege of the whole shores, and upon this point also the complainant produced some testimony.

The productiveness, in sea-weed, of that portion of the east

shore set off to the defendant, during the two years (1857 and 1858) when he occupied it, was sworn by the witness Covil, to be about twelve cart-loads; the principal portion of the sea-weed coming up on the south shore of the farm, and admissions of the complainant were proved confirmatory of this. A grand-son of the complainant testified that both shores of the farm produced from three hundred to one thousand cart-loads annu-ally; and that he had seen one hundred to one hundred and fifty loads on the north shore at different times, in past years. Another witness of the complainant's swore, that seven or eight years before he saw one hundred loads upon the northerly por-tion of the east shore, after a storm, but that he had never known so much there before or since. The complainant's wit-nesses did not speak to the annual productiveness of the east shore; but the testimony produced by the defendant was, that it was small and quite insufficient to manure the defend-ant's farm; and Dawley, the brother-in-law of the defendant, — but produced as a witness by the complainant, and who lived upon the place a year with Brown, — swore, that the sea-weed produced by both shores of the farm was about equal to what the complainant represented the third set off to Brown would produce.

The case was submitted to the court, in vacation, upon writ-ten arguments, which turned altogether upon the evidence.

*E. R. Potter*, for the complainant.

*W. Updike*, for the defendant Brown.

Ames, C. J. The power and duty of a court of equity to reform an instrument drawn by mistake, so as to make it ex-press what both parties originally intended, is unquestionable, whether the instrument be designed as evidence of an execu-tory or an executed contract, and whether the question arises between the parties to the instrument, or those claiming under them in privity, as heirs, devisees, judgment creditors, volun-tary grantees, or purchasers with notice. 1 Story, Eq. Jurisp. § 165. In the exercise of this jurisdiction the court will require for its action clear, full, and satisfactory proof of the mistake; and will, both in the spirit of the common-law rule which prohibits the admission of inferior evidence to contradict

that which is written, and of the statute of frauds, where it applies, proceed with great caution upon evidence resting in parol. Such a court would, however, in the language of a distinguished American jurist, "be of little value if it could suppress only positive frauds, and leave mutual mistakes, innocently made, to work intolerable mischiefs, contrary to the intention of the parties. It would be to allow an act, originating in innocence, to operate ultimately as a fraud, by enabling the party who receives the benefit of the mistake, to resist the claims of justice, under the shelter of a rule framed to promote it." 1 Story, Eq. Jurisp. § 155; see also §§ 156–159. Accordingly, in this country, as well as in England, although evidence inferior in its general nature is received for the purpose of correcting an undesigned variance between the real and the written contract, the courts refuse relief unless in cases clearly and unequivocally proved to require it; and hold, that it would be at least exceedingly difficult to prove the mistake, if the answer denied it, and there was nothing to rely upon but the recollection of witnesses. 2 Leading Cases in Equity; Hare & Wallace's notes, 680–684; Adams's Equity, 168, n. 1, 168–171, and cases cited.

The case stated for the complainant is, that in selling the north-east corner of his farm to his son, it was agreed between them that he should reserve two thirds of the sea-weed privilege of the tract, in distance upon the shore, and grant only one third of the privilege, measuring the third so granted from the east end of the Eldred line, southerly, upon the east beach, and that when his son afterwards parted with the farm by exchange to the defendant Brown, the latter agreed to take the farm upon this understanding of the extent of the sea-weed right held by his grantor, and to be conveyed to him; but that the scrivener employed to draw the deed from the complainant to his son, the description in which was copied into the deed from the son to Brown, instead of reserving to the complainant two thirds of the sea-weed privilege of the tract as agreed, granted, by the terms of the deed, the whole tract, carrying all rights and privileges with it, and then, nugatorily, attempted to limit the grant by a further grant of part only of that, the

whole of which had before been granted. It is true that if such a mistake was made, it arose, from ignorance of the principles of conveyancing on the part of the draughtsman of the first deed; but where an instrument is so drawn as to violate the intent of the parties to the agreement which it is designed to execute, through the draughtsman's ignorance of law, equity will correct the mistake, and thus produce a conformity of the instrument to the agreement, equally as if the draughtsman's mistake had arisen from his ignorance of facts. *Hunt* v. *Rousmaniere's Adm'r,* 1 Peters, Sup. Ct. R. 1, 13. A distinction is recognized between such a case, and a case in which the parties have deliberately agreed upon a certain kind of instrument which is, from its nature, best calculated in some respects to carry out their views, although in some contingencies which they did not contemplate, or, concerning the adaptation of the instrument to meet which, they were badly advised, it would not serve their purpose. In the one case, it is not the instrument upon which the parties have agreed; in the other, it is the precise instrument agreed to be given and received, although, had they contemplated or known its operation in every aspect, they would not probably have agreed upon it. *Ibid.*

The proof of the mistake alleged by the complainant is mainly derived from the internal evidence afforded by the deeds themselves; a source of evidence as high, because the same, as the instruments to be corrected, and, upon every principle, perfectly unexceptionable. 1 Story, Eq. Jurisp. § 168. No one can read the deeds, so far as they relate to the sea-weed privilege, without perceiving, that from ignorance of the distinction between an exception or reservation out of a grant, and an inconsistent explanation of what was granted, the transparent intent of the parties to them was, in this respect, miserably defeated. We must reject altogether the clause of explanation, the only one which expressly speaks of the sea-weed privilege, and taken by itself, clearly though inartificially tells what the parties intended with regard to it, before we can come to the conclusion that the complainant, in his deed to his son, designed to convey more than either one third of the whole shore privilege, in distance upon the shore of the farm out of

which this tract was sold, or one third of the privilege in distance, upon the shore of the tract. This third, whichever it was, was to be measured off, beginning at the north-east corner of the tract, which would bring it upon the east beach, and was to extend southerly upon that beach; the inference from the description being, that it would be exhausted upon the east beach, and before it reached Quonset Point. When, in addition to this, we consider the evidence of the scrivener who drew the deed, that the contract of the parties was that the grant should embrace only the north third of the sea-weed privilege, in distance upon the shore of the tract conveyed, and that by the deed as drawn he designed to carry out this contract, and supposed that he had done so; that this was explained to the defendant Brown, at the time of his purchase, and that he purchased upon this construction of the grant, the precise words of which were incorporated into that received by him; that the privilege was thus measured off by the scrivener, who was also the surveyor employed for that purpose by the complainant and Brown, and a post was by him set up on the east beach, as the southern bound of the shore privilege of Brown; that this bound was during the first season of his occupation repeatedly pointed out by Brown as the limit of his sea-weed privilege upon the shores of the tract; that the occupation of the parties during this season conformed to the bound, and Brown actually bought of the complainant sea-weed from the shores of the tract beyond the bound; and, lastly, that all this is, in effect, admitted in Brown's answer, as originally drawn, and, with the exception of what the contract with him originally was, in his amended answer, we cannot doubt that the original contracts of the complainant with his son and of his son with Brown were as alleged in the bill, and that by mistake of the scrivener and of all parties, the deeds were not, in respect to the sea-weed privilege, drawn in conformity to the contracts. Indeed, as suggested by the counsel for the complainant, Brown's cross-examination of the witness Smith, contains, in the form of a question personally put by him to that witness, an implied admission that such was his understanding until he had an opportunity to examine and understand the effect of his deed,

which, if he had understood before the survey sworn to by Smith, he never should have allowed the survey to be made.

Were this the whole case, our course of duty would be plain, to give to the plaintiff the relief which he asks. The aid of a court of equity in holding parties to their contracts, either by specifically enforcing them, or by correcting mistakes in the instruments executed as evidence of them, is always, however, limited by the countervailing equities, in the same matter, of those against whom it is invoked. These equities it compares and balances with those upon which it is required to act, and by virtue of them it modifies, or refuses altogether its relief, as will best conserve the cause of justice. Not only actual fraud, but surprise in the nature of it, a hard and unconscionable bargain, and even laches, may always be set up to bills of this nature, in total or partial defence, according to the circumstances. A strong example of this is found in the course of a court of equity with a bill to rescind a contract, on the ground of fraud; for, though the relief in such case is *strictissimi juris*, there may be circumstances which may justly mitigate the severity of the law; or may place the parties *in pari delicto;* or require the court, from the demerits of the plaintiff in the particular transaction, to abstain from the slightest interference. 2 Story, Eq. Jurisp. § 694.

Now the answer, in substance, sets up by way of defence to this bill, that the defendant, at the time he exchanged his farm in Exeter for this tract of land in North Kingston, was in a weak and excited condition of mind, which incapacitated him, not only from coping with the complainant, who principally managed the bargain on the part of his son, but from making with any one so important a contract; that having never seen the tract but once before the bargain was made, and then only the evening before, and being wholly unacquainted with its capabilities, the complainant and his son, amongst other things, represented to him, that the sea-weed privilege, which under the deed was to pass with the tract, would not only furnish sea-manure enough, annually, for the use of the place, but give him a surplus to sell, worth to him from fifty to seventy-five dollars per annum; that these representations were not only

-false, — the privilege concerning which they were made yielding only some fifteen cart-loads of sea-weed and eel-grass, a year, — but were known by both the complainant and his son to be so; and that in consequence of these misrepresentations he was, in his weak and excited condition, induced to exchange his Shaw farm, of one hundred and seventy-five acres, for a tract of thirty acres, which, without the privilege of sea-manure conveyed by the deed, is not worth more than a quarter of the value of the farm given in exchange.

Upon a careful consideration of the evidence submitted to us, on both sides, touching this matter in defence, we are constrained to say that it is substantially proved. The decided weight of the evidence is, that although the defendant Brown, has not, at any time, been an insane man, yet at the time of this exchange, and for some time previous and since, he was, and has been in a nervous and excitable condition, rendering him incapable of that caution and deliberation which a business transaction of such a nature requires. This is deposed to, not only by members of his family, and by his neighbors, but by a highly respectable witness, Mr. John J. Reynolds, with whom he has lived, at different times, for eight or ten years, as an assistant in his shop, in North Kingston. Even the complainant's witness, Harris Smith, undesignedly confirms this testimony by his narrative of the pleased condition of Brown when going to make the bargain of exchange, congratulating himself as he went up the road from the shop of Smith, with the saying of " a fool for luck ; " and hallooing to the witness as he repassed the shop on his return from making the bargain, the same expression. This state of excitement alone, and if he had been fairly dealt with, certainly would not have ·been sufficient to impeach the contract made under it, or even to have furnished a reason why, there being a mistake in the deed, he should not be held to his bargain. But the evidence further shows, that strong representations of the productiveness and value of the sea-weed privilege to be granted, were made by the complainant to satisfy him and his family of the expediency of the exchange, and precisely as stated in the answer. Four witnesses, one of them produced by the complainant, swear to these rep-

34 *

resentations; and there is much other evidence in the case coming from both sides, that shows what prevailing effect, in his then excited condition, these representations had upon the defendant. If his friends objected that the tract, for which he purposed to exchange his farm had no firewood upon it, his answer was, that he should have surplus sea-weed enough to buy it with; if, that it was illy fenced, the surplus sea-weed was the fund out of which this want was to be supplied. His heated expectations in this matter, in the absence of all personal knowledge, must have been built upon the representations of the complainant and his son; and as these related to a fact, and not to opinions merely, if falsely, and especially if fraudulently made, they raise up a strong equity in defence to the bill. Now the evidence, upon examination shows, that the portion of the shore which by the alleged contract was to be measured off to the defendant for a sea-weed privilege, was the most unproductive part, for this purpose, of the shores of the tract; that, although on one occasion, about eight or ten years ago, some hundred cart-loads of sea-weed were, after a violent storm, cast upon it, yet that its annual product in this way is, in general, small, and insufficient even to manure the tract, not yielding more than from twelve to fifteen loads a year; and, indeed, that the whole shore of the granted tract, — for such is the testimony of Dawley, the complainant's witness, — will not yield more sea-weed, annually, than the complainant represented might be obtained from that portion of it which, by contract, was to be measured off to Brown. The evidence further shows, not only that these representations of the complainant were not known to him to be true, but that they were known by him to be false; this being inferable not only from his knowledge, as former owner of the premises, of the relative value of the different parts of the shore for sea-weed, but from his own admissions and boasts of the great bargain he had got out of the defendant, made just after it was executed. The result is, that the complainant, as the weight of the proof indicates, has obtained for his son decidedly the advantage in the exchange of farms, even if we leave the parties precisely where we find them; but if we correct the mistake which was made in drafting the

deeds, his son will have an advantage in the bargain, according to the complainant's estimate, of from a thousand to fourteen hundred dollars.

It is no answer to this to say, that the defendant sought the exchange, — was rejoiced at it when made — and even boasted of his sea-weed privilege afterwards, until his experience of its unproductiveness had corrected the impressions made by the misrepresentations of the complainant. All this merely shows how entirely, in his eager and excited state, he trusted to the inflamed statements of his opponent in the bargain, of which he should have been wary, and how completely he has, in consequence, been overreached by him.

Under such circumstances, a mistake in the conveyance which executed the contract having providentially balanced the mischief wrought by the misrepresentation which procured it, the most perfect justice will be done by not interfering with this most equitable adjustment, and by dismissing the bill of the party who seeks to disturb it, with costs.

By the amended answer, it appears, that the defendant now claims under his deed not only the sea-weed landed on the shores of the tract conveyed to him, but a sea-weed privilege, also, in one third of the remaining shore of the complainant's farm. As this may lead to further litigation, we think it proper to add, that such a claim finds no support in the language of the deed under which it is made. This compels the defendant to begin to measure his third, in distance upon the shore, from the north-east corner of the tract conveyed, although it does not limit, as it was designed to do, the effect of the preceding conveyance to him, of the whole tract with its appurtenances. *Bill dismissed, with costs.*